IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| )<br>KRISTY YEARGAIN, individually; RYAN )<br>and LYNETTE BENZIE, husband and wife; )<br>MARK and KRISTEN ENGELS, )<br>husband and wife, )<br> )<br> )<br>                              Plaintiffs, )<br> )<br>v.                            )<br> )<br>BENJAMIN LANDRY, individually; JOHN )<br>McCORMICK, individually; and QWEST )<br>COMMUNICATIONS, a foreign )<br>corporation, )<br> )<br>                            Defendants. )<br>_____ ) | Case No. CV 06-148-S-MHW<br><br>**MEMORANDUM DECISION**<br>**AND ORDER** |

Currently pending before the Court is Defendant Qwest Communication and John

McCormick's Motion for Partial Summary Judgment (Docket No. 35), filed September 1, 2007.

For the following reasons, this motion will be granted in part and denied in part.

**I.**
**Introduction**

Plaintiffs Kristy Yeargain, Ryan and Lynette Benzie, husband and wife, and Mark and

Kristen Engels, husband and wife, brought this action against Defendants Benjamin Landry, John McCormick and Qwest Communications on February 24, 2006, in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of Ada.  Defendants Qwest Communications ("Qwest") and John McCormick removed the case to this Court on April 13, 2006.

Plaintiffs bring claims of battery, negligent infliction of emotional distress, intentional infliction of emotional distress, negligent hiring, supervision, training and retention, violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), violations of the Idaho Human Rights Act ("IHRA") and loss of consortium.

This case arises out of a series of incidents that occurred at Qwest's office in Boise, Idaho.  Plaintiffs Kristy Yeargain, Kristen Engels and Lynette Benzie allege they were subjected to sexual harassment, including physical touching, by Benjamin Landry ("Landry") and John McCormick ("McCormick") and suffered severe emotional distress as a result.  They also allege that Qwest either knew or should have known that Landry and McCormick were engaged in this behavior.

## II.
## Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Rule 56, which provides in pertinent part, that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007).

A moving party who does not bear the burden of proof at trial may show that no genuine

issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.,* at 250. "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.,* at 254. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

    In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591 (9th. Cir. 1981).

    The Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992). The Ninth Circuit has found that in order to resist a motion for summary judgment,

> the non-moving party:  (1) must make a showing sufficient to
> establish a genuine issue of fact with respect to any element for

> which it bears the burden of proof; (2) must show that there is an
> issue that may reasonably be resolved in favor of either party; and
> (3) must come forward with more persuasive evidence than would
> otherwise be necessary when the factual context makes the non-
> moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund,* 882 F.2d 371,

374 (9th Cir. 1989).

## III.
## Discussion

A.    **Facts Common to All Parties**[1]

Qwest publishes, distributes and trains its employees on its Code of Conduct which

contains an anti-harassment policy that reads, in part:

> Each employee is responsible for ensuring that his or her conduct
> is free of any actions that constitute discrimination or harassment
> under the Code, policies and M&Ps...
> Sexual harassment can include unwelcome sexual advances,
> requests for sexual favors, unsolicited physical conduct,
> unwelcome flirtations, offensive verbal, visual or physical conduct
> of a sexual nature, suggestive or lewd remarks, unwanted hugs or
> touches, offensive jokes or visuals, pornography and sexually
> explicit material.
> If you observe or experience any form of harassment, report it to
> your supervisor or the Corporate Compliance Advice Line at: 1-
> 800-333-8939 or AdviceLine@Qwest.com.

*Declaration of Michael Ward, "Ward Dec.," Part I*, Ex. A, p. 9 (Docket No. 43).  Prior to May

2005, all three Plaintiffs and the two individually named Defendants had completed Qwest's

training on the Code of Conduct at least once.  *Declaration of Shelly Cozakos, "Cozakos Dec.,"*

Ex. B., *"Deposition of Kristen Engels," "Engels Dep.,"* Exs. 2 and 3 (Docket No. 42);

---

[1]  Because there are several parties involved, the Court will discuss each plaintiff and his or her respective
claims, including the relevant facts and applicable law, on an individual basis.  First, the Court will detail facts that
are relevant to all the parties in this action.

*Declaration of Linda Walton "Walton Dec.,"* Ex. C., *Deposition of Lynette Benzie, "Benzie*

*Dep.,"* Exs. 2, 3 and 4 (Docket No. 47-2); Ex. D, *Deposition of Kristy Yeargain*, *"Yeargain*

*Dep.,"* Exs. 6, 7, and 8 (Docket No. 47-2); *Declaration of Bruce Blomquist*, *"Blomquist Dec.,"*

Exs. A and B (Docket No. 41).

 During the relevant time period, Defendant McCormick was a supervisor to Ms.

Yeargain and Ms. Engels.[2]  Defendant Landry did not supervise any of the Plaintiffs.

 In January 2004, Tammy Edwards, a Human Resources Manager, called the Qwest

Advice Line to report a complaint made by Greg Tomlinson and Michael Sorini regarding

conversations between Landry and coworker Stacy Kellogg, who were involved in a relationship

at the time.  *Affidavit of David E. Comstock in Support of Plaintiffs' Response to Motion for*

*Partial Summary Judgment Filed on September 1, 2007, "Comstock Aff.,"* Ex. 1 (Docket No. 50-

2)  The complaint revolved around conversations between the two individuals that were

described as being flirtatious and disruptive, and included various sexual innuendos, stories of

Landry playing with his penis as a child and use of the word "shit" 20 to 30 times.  *Id*.  Later,

Tammy Edwards had a discussion with Landry and Ms. Kellogg, which was documented, and

informed them to discontinue this behavior.  *Id*.[3]

---

[2] *See Plaintiff's Response to Motion for Partial Summary Judgment*, p. 6 (Docket No. 48), referring to McCormick as Ms. Engels's manager.

[3] McCormick also received a "documented discussion" in 2004 for "comments made to an employee, inappropriate work conversation." *Comstock Aff.*, Ex. 11.  It not clear what elicited this discussion.  Plaintiffs state it was regarding sexually offensive comments McCormick made to a male employee about receiving a lap dance for his birthday.  *See Response to Motion for Partial Summary Judgment*, p. 4 (Docket No. 48).

**B.     Plaintiff Lynette Benzie[4]**

In February of 2004, Ms. Benzie was eating soup in the lunchroom when Landry, who she did not know at the time, came into the room and said "yeah, suck up those noodles girl."[5] *Ward Dec., Part II*, Ex. D (Docket No. 44).  The following day, Ms. Benzie was buying a soda in the breakroom when Landry came up behind her, put his arms around her, picked her up, kissed her neck and shook her up and down.  *Walton Dec.,* Ex. C*, Benzie Dep.*, p. 78, ll. 9-17.  Ms. Benzie told one or two female coworkers about the incident and at one's suggestion, on February 12, 2004, wrote a "to whom it may concern" letter describing what happened.  *Ward Dec.*, Ex. D; *Affidavit of David E. Comstock in Support of Plaintiffs' Response to Motion for Partial Summary Judgment Filed on September 1, 2007, "Comstock Aff.,"* Ex. 3 (Docket No. 50-4).  Ms. Benzie testified that after she wrote her letter, she received no response.[6]  *Comstock Aff.*, Ex. 8, *Benzie Dep.*, pp. 52-54 (Docket No. 50-9).  Her coworker reported the incidents to Tammy Edwards who called the Qwest Advice Line and reported the matter.  *Ward Dec.*, Ex. D.  Qwest opened a file on the matter and an investigation took place as a result of the letter and phone call. *Id*.  Landry denied picking Ms. Benzie up but admitted putting his hands on her shoulders, shaking her and saying "wake up, girl" because she looked tired.  *Id*.  He also denied ever

---

[4]  Ms. Benzie made a complaint of disability discrimination in the summer of 2004.  *Ward Dec*., Ex. G. She alleged she was penalized for taking disability benefits by not being afforded additional time to reach a "fully competent" job status to attain a higher wage scale.  *Ward Dec.*, Ex. F.  The subsequent investigation that occurred found there was no violation of Qwest policy.  *Id*.

[5]  Ms. Benzie asserts Landry's actual statement was "suck me like those noodles."  *Comstock Aff.*, Ex. 8, *Benzie Dep.*, pp. 232-235.  Ms. Benzie states that she did not feel comfortable writing this statement in her letter which described the incident because she was wrote it during work hours at her desk, when others could see her computer screen.  *Id*.

[6]  Ms. Benzie's written statement was provided to an investigator by her coworker.  Ms. Benzie did not further cooperate in the investigation and did not return the investigator's phone calls or emails.  *Ward Dec.*, Ex. D.

**Memorandum Decision and Order - Page 6**

making a comment about her eating noodles. *Id*.   On March 16, 2004, the investigator

concluded that her findings supported a violation of Qwest's Sexual Harassment Policy. *Id*.

Landry was given a written warning restating the sexual harassment policy and notified that

further violation could result in further disciplinary action, including termination. *Id*; *Cozakos*

*Dec.*, Ex. A, *Deposition of Benjamin Landry*, *"Landry Dep.,"* Ex. 9.

       After the March 2004 investigation and warning given to Landry, fifteen months elapsed

before another incident occurred between Landry and Ms. Benzie.  In May 2005, Ms. Benzie

claims Landry massaged her back while she was on a telephone call with a customer. *Comstock*

*Aff.*, Ex. 8, *Benzie Dep.*, pp. 279-283.  Ms. Benzie told him to keep his hands off her and he left.

*Id*.  She did not report this incident.

       The next incident involving Ms. Benzie occurred in approximately June 2005 and

involved McCormick who was not her supervisor.  Ms. Benzie claims that McCormick put his

hands under her shirt and stroked her skin near her waist. *Ward Dec.*, Ex. E.  She claims she told

Gena Tomlinson, her manager, about this incident and Ms. Tomlinson told her she would take

care of it. *Ward Dec.*, Ex. E.  Ms. Tomlinson denies being informed of this incident. *Comstock*

*Aff.*, Ex. 23, *Gena Tomlinson Deposition, "Tomlinson Dep.,"* p. 46 (Docket No. 50-24).

       In August 2005, Ms. Benzie took a four-month leave of absence.  In January 2006, she

stated this leave of absence was in response to "sexual harassment issues" that she had

previously  notified Jodi McCrosky, Jill Monteith and Wade Bradley about and "nothing was

done."[7] *Ward Dec.*, Ex. E.

---

    [7] It appears the "notification" of sexual harassment issues to these named individuals relates back to Ms.
Benzie's February 2004 complaint involving Landry, which these three individuals were aware of at the time. *See*
*Comstock Aff.*, Ex. 8, *Benzie Dep.*, pp. 52-53.

**Memorandum Decision and Order - Page 7**

In mid-December of 2005, Ms. Benzie returned to work after her leave of absence.  *Id.* At the time of her return, Landry was no longer employed by Qwest, having been terminated on August 29, 2005.  *Cozakos Dec.*, Ex. A, *Landry Dep.*, Ex. 18.  On January 20, 2006, Ms. Benzie contacted the Qwest Advice Line complaining that McCormick had sexually harassed her in the summer of 2005, when he stuck his hands under her shirt near her waist.  *Ward Dec.*, Ex. E.  She claimed that she told her manager, Gena Tomlinson, about this incident after it occurred.  *Id.* She also alleged that in 2004 and 2005, McCormick would make comments about how she looked sexy, that her breasts looked big, among other things.  *Id.*  She also informed the Advice Line that when she returned to work in December, McCormick made the comment "Well it's nice to have my eye candy back."  *Id.*  She claimed that she told Ms. Tomlinson about this comment and that Ms. Tomlinson told her to learn how to deal with it.  *Id.*  Ms. Tomlinson denies being informed of the incident and making that statement to Ms. Benzie.  *Comstock Aff.*, Ex. 23, *Tomlinson Dep.*, p. 46.   In her complaint to the Advice Line, Ms. Benzie also mentioned prior harassment by Landry.  *Ward Dec.*, Ex. E.

As a result of Ms. Benzie's phone call on January 20, 2006, an investigation was conducted by Rebecca Acevedo.  *Ward Dec.*, Ex. E.  During the course of her investigation, Ms. Acevedo interviewed seven of McCormick's subordinates, four of whom were female.[8]  *Id.*  She also interviewed Ms. Benzie's friend.  *Id.*  McCormick's subordinates reported they had never witnessed any inappropriate comments or touching by him.  *Id.*  One witness, Ms. Benzie's friend, stated that McCormick had never directed inappropriate comments toward her but she felt he stared at her body parts which made her uncomfortable.  *Id.*  Ms. Acevedo issued a report

---

[8]  Ms. Benzie never worked on McCormick's team.  *Ward Dec.*, Ex. E.

**Memorandum Decision and Order - Page 8**

stating that her findings did not support a violation of the sexual harassment policy.  *Id.*

### 1.     Title VII and IHRA Sexual Harassment Claims

Under Title VII, it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).[9]  Title VII's prohibition not only applies to situations with tangible[10] or economic discrimination but also to situations where sexual harassment is so severe or pervasive that it alters the conditions of the plaintiff's employment and creates a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).  To show that a plaintiff was subject to a hostile work environment, he or she must prove that: (1) he or she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his or her employment and create an abusive work environment.  *Porter v. California Dep't of Corrections*, 419 F.3d 885, 892 (9th Cir. 2005).  A hostile work environment must be found to be "both subjectively and objectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be

---

[9]  The IHRA embodies the policies of the Civil Rights Act of 1964.  I.C. § 67-5901(1).  When interpreting the IHRA, courts are guided by federal law.  *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 123 Idaho 650, 653, 851 P.2d 946, 949 (1993).

[10]  A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998).  There are no allegations of  tangible employment discrimination in this case.

**Memorandum Decision and Order - Page 9**

so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).[11]

When harassment by a coworker is alleged, the employer will be held liable only where its own negligence is a cause of the harassment. *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001). The employer is responsible for its own acts or omissions. *Id*. at 1191-92. If the employer fails to take corrective action after learning of an employee's sexually harassing conduct, or takes inadequate action that emboldens the harasser to continue his misconduct, the employer can be deemed to have "adopted the offending conduct and its results, quite as they had been authorized affirmatively as the employer's policy." *Id*. at 1192 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998)). The employer's liability, if any, runs from the time it knew or should have known about the conduct and failed to stop it. *Id*. When management-level employees know of the offending behavior, the Ninth Circuit has held the employer has "actual knowledge" of the alleged harassment. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119-20 (9th Cir. 2004). In *Burrell v. Star Nursery, Inc.*, the Ninth Circuit held that where there was no indication that anyone witnessed the incidents and plaintiff did not report

___

[11] Qwest initially moved for summary judgment on the affirmative defense set forth by *Ellerth v. Burlington Industries, Inc.*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) (known as the *Ellerth/Faragher* affirmative defense). Those cases recognized that when there is no tangible employment action, an employer can be vicariously liable for an actionable hostile work environment created by a supervisor with immediate, or successively higher, authority over the employee. *Ellerth v. Burlington Industries, Inc.*, 524 U.S. 742, 765 (1998). However, the defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *Id*. The defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Id*. In its reply brief, Qwest does not address this affirmative defense and instead focuses on whether it knew or should have known about the alleged harassment. *See Reply Brief of Defendants Qwest and McCormick* (Docket No. 51). The *Ellerth/Faragher* affirmative defense does not apply in the case of alleged coworker harassment. *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001). Landry did not supervise any of the Plaintiffs. In the case of McCormick, he was not Ms. Benzie's immediate supervisor so he is to be treated as a coworker. *See id.*; *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 n.13 (9th Cir. 2004) (noting that case law does distinguish between situations in which a harasser supervises the plaintiff versus situations in which a harasser is a supervisor and yet does not supervise the plaintiff with vicarious liability only attaching for actions by a supervisor who has immediate, or successively higher, authority over the employee).

**Memorandum Decision and Order - Page 10**

any alleged harassment to management, there was no evidence that the employer knew or should have known about the alleged sexual harassment.  170 F.3d 951, 955 (9th Cir. 1999).

Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is "reasonably calculated to end the harassment."  *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001).  The court must consider the overall picture in determining whether the response was appropriate.  *Id.* at 1197.  The appropriateness of the remedy will depend on the seriousness of the offense, the employer's ability to stop the harassment, the likelihood the remedy will end the harassment, and the remedy's ability to persuade potential harassers to refrain from unlawful conduct.  *Intlekofer v. Turnage*, 973 F.3d 773, 779 (9th Cir. 1992).  The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.  *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001).

Notably, the Ninth Circuit has recognized that an employer is only responsible for acts of misconduct that occur after it has been put on notice.  *Id.* at 1192 n.6.  In that case, the Ninth Circuit held that where the plaintiff had never complained to management about the harasser's conduct until a specific date, the employer could not be held liable for its action, or inactions, prior to that date.  *Id.*

### a.   Qwest

Qwest asserts that when Ms. Benzie's complaint was brought to its attention on February 13, 2004, it promptly investigated and issued Landry a written warning on or about March 16, 2004.  Regarding the harassing behavior that occurred after that time, Qwest contends it was unaware of any such behavior and cannot be expected to respond to conduct of which it is

unaware.  Qwest maintains there is no evidence from which a reasonable trier of fact could

conclude that Qwest should have known Landry was harassing Ms. Benzie after he was

disciplined in March of 2004.  Ms. Benzie maintains the January[12] and March 2004 disciplinary

actions taken against Landry were not sufficient remedial actions to deter his conduct.  In

addition, Ms. Benzie submits that because she was not informed of the disposition of her

complaint, she had no incentive to continue reporting the conduct and thus discontinued doing

so.

Regarding McCormick, once Ms. Benzie reported his conduct to the Qwest Advice Line,

it immediately investigated her complaint and ultimately found it to be unsubstantiated.

Although she claims she made an earlier complaint to Ms. Tomlinson, Qwest asserts that Ms.

Benzie was unreasonable in not taking advantage of the alternative means of reporting to the

Advice Line, once Ms. Tomlinson allegedly failed to take action regarding her complaint.

With respect to Ms. Benzie's claim based on Landry's conduct, the Court grants

summary judgment in favor of Qwest.  Ms. Benzie made a complaint regarding Landry's

conduct in February 2004 that was promptly investigated and resulted in a disciplinary written

warning in March 2004.  The Court finds that based on the allegations before Qwest at that time,

this was an adequate remedial measure reasonably calculated to end the harassment.  Ms. Benzie

now alleges Landry harassed her in 2005 by massaging her shoulders and making offensive

comments.  Qwest was not on notice of this conduct, Ms. Benzie did not report it and there is no

evidence that anyone witnessed it.  From Qwest's viewpoint, after it issued a written warning to

Landry in March 2004, no further harassment occurred for the next fifteen months.  By the time

---

[12] The January 2004 disciplinary action was the "documented discussion" involving Landry and Ms.
Kellogg as a result of a complaint made about their inappropriate and sexual conversations.

**Memorandum Decision and Order - Page 12**

Ms. Benzie made a complaint to the Qwest Advice Line in January 2006, Landry had already been terminated. The Court finds that Qwest was took adequate remedial measures to correct the conduct it had knowledge of.

In regard to Ms. Benzie's claim against Qwest based on McCormick's conduct, the Court finds there is a genuine issue of material fact whether Qwest should have known about the alleged harassment. Ms. Benzie asserts she reported the incident of McCormick putting his hand up her shirt to her manager, Gena Tomlinson, after it occurred. Ms. Tomlinson denies this. The Court finds that there is a disputed issue of material fact regarding this incident. If the finder of fact concludes that Ms. Benzie did report the incident to her supervisor, knowledge would be imputed to Qwest. Summary judgment on this aspect of Ms. Benzie's claim will be denied.

> **b.** **McCormick**

Both the Ninth Circuit and the Idaho Supreme Court have recognized that Title VII and the IHRA do not provide for individual liability against the harassing employee. *See Craig v. M&O Agencies*, 496 F.3d 1047, 1058 (9th Cir. 2007) ("We have long held that Title VII does not provide a separate cause of action against supervisors or co-workers"); *Paterson v. State of Idaho*, 128 Idaho 494, 501, 915 P.2d 724, 731 (1996) ("this Court...held there is no individual liability of an employee under IHRA"). To the extent that Ms. Benzie alleges an individual claim against McCormick for sexual harassment under Title VII and the IHRA, summary judgment will be granted in favor of McCormick.

> **2.** **Intentional Infliction of Emotional Distress**

To prove intentional infliction of emotional distress, a plaintiff must show the following four elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme

and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *McKinley v. Guaranty Nat'l Ins. Co.*, 144 Idaho 247, 159 P.3d 884, 891 (2007). To qualify as extreme and outrageous, the defendant's conduct must be more than merely objectionable or unreasonable. *Alderson v. Bonner*, 142 Idaho 733, 740, 132 P.3d 1261, 1268 (Ct. App. 2006). "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of atrocious and beyond all possible bounds of decency that would cause an average member of the community to believe it was outrageous." *Id.* (internal quotations omitted). The Idaho Supreme Court has noted that the district court acts as a gatekeeper for these claims, weeding out weak causes of action. *McKinley v. Guaranty Nat'l Ins. Co.*, 144 Idaho 247, 159 P.3d 884, 891 (2007). The district court may grant summary judgment when the alleged facts could not be reasonably regarded as so extreme or outrageous as to permit recovery for intentional infliction of emotional distress. *Id.*

Qwest maintains its conduct was not intentional and cannot constitute extreme or outrageous behavior. McCormick asserts that the conduct Ms. Benzie complains of is not sufficiently severe or pervasive to support this claim against him. Ms. Benzie maintains Qwest acted intentionally and recklessly when it failed to take remedial measures to protect its employees against sexual harassment. Also she contends that Ms. Tomlinson was aware of McCormick's behavior toward her in early 2005 and did nothing about it. This, along with McCormick and Landry's behavior, she argues exceeds all bounds of decency and is extreme and outrageous.

        a.      **Qwest**

The Court finds that there are no genuine issues of material fact and that Ms. Benzie does

not survive summary judgment.  There is an absence of evidence in support of this claim.  The

facts as alleged by Ms. Benzie do not amount to extreme and outrageous conduct on the part of

Qwest.[13]  When complaints were made to the Qwest Advice Line in 2004, Qwest took the

necessary steps to investigate and substantiate the complaints and disciplined the offenders when

warranted.  Concerning the allegation that Ms. Tomlinson was aware of the harassment, even

assuming that it is true, it does not amount to outrageous conduct.  Summary judgment will be

granted in favor of Qwest.

### b.    McCormick

The Court finds that genuine issues of material fact exist as to whether McCormick

committed the acts Ms. Benzie alleges and if so, whether those amount to extreme and

outrageous conduct.  Summary judgment will be denied.

### 3.    Negligent Hiring, Training, Supervision and Retention

A negligent supervision claim is based on the employer's own negligence in failing to

exercise due care to protect third parties from the foreseeable tortious acts of an employee.

*Rausch v. Pocatello Lumber Co., Inc.*, 135 Idaho 80, 86, 14 P.3d 1074, 1081 (Ct. App. 2000).  A

negligent supervision claim encompasses conduct of the employee that is outside the scope of

employment.  *Id.*  An employer's duty of care requires that an employer who knows of an

employee's dangerous propensities control the employee so that he or she will not injure third

parties.  *Id.*

Qwest asserts that the facts are undisputed that it was unaware of any information that

---

[13] *See Craig v. M&O Agencies, Inc.*, 496 F.3d 1047 (9th Cir. 2007) (noting that under Arizona law, an employer is rarely liable for intentional infliction of emotional distress when one employee sexually harasses another).

would demonstrate negligence in hiring either Landry and/or McCormick.  Further, when it became aware of potential inappropriate conduct, it terminated Landry and disciplined McCormick.

Plaintiffs contend that Qwest knew of Landry and McCormick's acts of sexual harassment against female employees and their propensities to continue committing the same. The behavior continued and Plaintiffs maintain there is no evidence that supervisors at Qwest monitored, disciplined or took action to change or control Landry or McCormick's conduct.

Similar to the Title VII/IHRA analysis that revolves around Qwest's negligence, the Court finds there are genuine issues of material fact as to foreseeability of McCormick's acts toward Ms. Benzie, based on whether Ms. Tomlinson was aware of the alleged conduct.  As for Landry, the Court finds that there is no evidence that Qwest should have had reason to know that Landry acted inappropriately toward Ms. Benzie as she never reported his conduct after February 2004.  Again, from Qwest's perspective, once it became aware of Ms. Benzie's complaint in February 2004, it took prompt action to correct the behavior and did not hear of any further incidents.  Without reason to know of the incidents in 2005, Qwest cannot be found negligent in training, supervising or retaining Landry.[14]  *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287 (11th Cir. 2007).

## C.    **Plaintiff Kristy Yeargain**[15]

After Ms. Benzie's complaint in February 2004, the next incidents involving Landry

---

[14]  There are no allegations that would support a negligent hiring claim against Qwest.

[15]  In June 2004, Ms. Yeargain's attorney sent a charge of discrimination alleging that Tammy Edwards harassed and retaliated against her for taking ADA and FMLA leave.  *Ward Dec.*, *Part III*, Ex. F (Docket No. 45). An investigation took place and the investigator concluded that there was a violation of Qwest's Non-Discrimination Policy by Ms. Edwards.  *Id.*

**Memorandum Decision and Order - Page 16**

occurred in the spring and summer of 2005.  In or around April of that year, Landry walked up to Ms. Yeargain in the hallway, gave her a hug, grabbed her breast and commented that she had lost a lot of weight but her breasts were still getting bigger.  *Comstock Aff.*, Ex. 12, *Deposition of Kristy Yeargain*, *"Yeargain Dep.,"* pp. 48-49.  Another time, Landry had pulled at Ms. Yeargain's shirt, looked down her shirt and threw a stress ball down it.  *Declaration of Linda Walton, "Walton Dec.,"* Ex. A., *Deposition of Michael Ayars, "Ayars Dep.,"* p. 90.  Landry also touched Ms. Yeargain's crotch and told her if she needed any help down there, to let him know.  *Comstock Aff.*, Ex. 12, *Yeargain Dep.*, p. 55.

Landry was promoted at Qwest in June 2005, and around that time, Ms. Yeargain brought these incidents to the attention of her supervisor, McCormick.  *Id.*, pp. 51-53.  Ms. Yeargain asked McCormick not to do anything about it, such as reporting her complaint to the Advice Line, but did say she wanted it taken care of.  *Id.*, pp. 53, 217, 227.  McCormick decided to talk to Landry about the incidents.  *Id.*[16]  Landry later apologized to Ms. Engels[17] and asked her to apologize to Ms. Yeargain on his behalf.  *Id.*  Ms. Yeargain had no further contact with Landry.  *Id.*, p. 55.  Ms. Yeargain also told her father, a manager at Qwest, about Landry's conduct and he contacted someone who worked in Human Resources.  *Id.*, pp. 112-113.  It is not clear exactly when Ms. Yeargain told her father about Landry's conduct.

On July 21, 2005, Allison Wenick, a Telesales Manager, called the Qwest Advice Line and reported that Landry had made comments about her breasts and repeatedly asked her if she

---

[16] Plaintiffs state that Landry asserts McCormick never spoke to him.  *Plaintiff's Statement of Disputed Facts in Support of Response to Motion for Partial Summary Judgment Filed on September 1, 2007*, p. 5 (Docket No. 49).  There is no cite to the record for this statement.

[17] Ms. Engels's complaints are detailed in the next section.

was pregnant.  *Ward Dec.*, Ex. B.  Landry's supervisor, Jodi McCrosky, stated that she wanted

the EEO to investigate because it was Landry's "second issue."[18]  *Id.*  Qwest Legal Affairs

Department EEO investigator Michael Ayars was assigned to investigate Ms. Wenick's

complaint.  During the investigation, Mr. Ayars was informed by Ms. Engels and Ms. Yeargain's

coworker, Mr. Lamansky, of some of their complaints.  *Walton Dec.*, Ex. A, *Ayars Dep.*, pp 57,

79, 83, 90, Ex. 2.  Mr. Ayars then interviewed Ms. Engels and Ms. Yeargain and discovered the

various allegations of Landry's offensive comments and inappropriate touching.  *Id.*  Ms.

Yeargain also told Mr. Ayars that she had complained to her manager, McCormick, about

Landry's behavior.  *Id.*, p. 57.  On August 23, 2006, Ms. Yeargain sent an email to Mr. Ayars

asking about the outcome of the investigation, whether there would be a settlement offer, if she

would need to sign anything, and if she, as a victim, got "anything out of this."  *Walton Dec.*, Ex.

D., *Yeargain Dep.*, Ex. 12.

 During the course of the investigation, Mr. Ayars also interviewed Landry's supervisor,

Jodi McCrosky and Ella Morgan, another Qwest manager.  *Comstock Aff.*, Ex. 16, Ex. 17, *Ayars

Dep.*, pp. 62-63, pp. 77-78, Ex. 18.  Mr. Ayars's notes from his interview with Ms. McCrosky

indicate that there were rumors that Landry was sleeping with other employees and also that he

had been talked to in March 2004 about his conduct.  *Id.*  His interview with Ms. Morgan also

suggested rumored affairs between Landry and female employees.  *Id.*  Landry communicated to

Mr. Ayars that he never inappropriately grabbed or touched anyone while he worked at Qwest.

*Cozakos Dec.*, Ex. A, *Landry Dep.*, p. 114.  Landry also stated he believed Ms. Yeargain and Ms.

---

[18] Plaintiffs dispute that this was only Landry's "second" issue.  They contend there was a documented discussion in January 2004, a written warning in February 2004, and the complaint Ms. Yeargain made to McCormick in approximately June 2005.  *Comstock Aff.*, Ex. 1;  *Ward Dec.*, Ex. D; *Comstock Aff.*, Ex. 12, *Yeargain Dep.*, pp. 337-339.

**Memorandum Decision and Order - Page 18**

Engels were out to get him fired.  *Id.*, p. 99.

On August 29, 2005, Landry was terminated from his employment with Qwest for violations of Qwest Code of Business Ethics and Conduct in the areas of Sexual Harassment. *Id.*, Ex. 18.[19]  That same day, McCormick received a written disciplinary action for not following Qwest Code of Conduct by failing to report Ms. Yeargain's complaint to the Qwest Advice Line. *Walton Dec.*, Ex. B, *Deposition of John McCormick*, *"McCormick Dep.,"* Ex. 5.

The day before McCormick received this warning, Ms. Yeargain's father, Wayne Gomes, sent an email to Human Resources detailing an incident in which Ms. Yeargain ran into McCormick outside of work and told her "I understand there's a lawsuit, you put me into an awkward position, I'll be mad if you file a lawsuit and I get in trouble."  *Ward Dec.*, Ex. C.  He also stated "I may get fired over this."  *Id.*  The email was forwarded to the Qwest Advice Line and Mr. Ayars was assigned to investigate.  *Id.*, Ex. D.  On October 7, 2005, McCormick received a second written disciplinary action from Qwest for violating Qwest's Sexual Harassment policy, specifically regarding confidentiality and non-retaliation, by discussing an EEO investigation with an employee who was part of the investigation.  *Walton Dec.*, Ex. B, *McCormick Dep.*, Ex. 6.  As a result of this policy violation, McCormick received a "Needs Improvement" rating on his 2005 employee evaluation and was not be eligible for a pay increase or stock options in 2006.  *Id.*

## 1.    Title VII and IHRA Sexual Harassment Claims

Qwest maintains there is no reason prior to June of 2005, when Ms. Yeargain complained

---

[19]  Landry contested his termination.  This resulted in a negotiated separation agreement in which Qwest paid him $2,500.00 to discontinue his grievance process.  *Comstock Aff.*, Ex. 2, *Deposition of Tammy Edwards*, pp. 64-65.

to McCormick, that it should have known of Landry's harassment of Ms. Yeargain.  Although

Mr. Landry had been involved in previous incidents, he had been disciplined and Qwest was not

aware of any further incidents until the summer of 2005.  Once Ms. Yeargain told McCormick

about Landry's behavior, Qwest submits McCormick took adequate remedial action, by speaking

to Landry, and after that discussion, there is no evidence that Landry ever again subjected Ms.

Yeargain to any type of harassment.  *See Jarvis v. SigmaTron*, 223 F. Supp. 2d 981 (N.D. Ill.

2002) (precluding a finding of negligence where after female employee's second complaint to

supervisor, he spoke to alleged harasser and she was not really bothered by him again).  Ms.

Yeargain asserts that Qwest knew of the harassment starting in January 2004.  She also asserts

that McCormick was aware of the harassment once Ms. Yeargain spoke to him and failed to take

adequate remedial action because he did not report the incident as required by the Code of

Conduct.

> a.    **Qwest**

Based on the law set forth above, the Court finds there is no evidence indicating Qwest

knew or should have known of Landry's conduct toward Ms. Yeargain until she reported it to

her manager, McCormick, in June 2005.  From February 2004 to June 2005, a period of sixteen

months, Qwest was not informed of any inappropriate or offensive conduct by Landry.  Ms.

Yeargain had no contact with Landry after she made her complaint to McCormick.  The Ninth

Circuit has held that an employer cannot be held liable for acts of misconduct until it is on

notice.  *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001).  In this case, that was the date

Ms. Yeargain complained to McCormick.  Ms. Yeargain had no further contact with Landry and

therefore there can be no liability on the part of Qwest.

**Memorandum Decision and Order - Page 20**

To the extent that Ms. Yeargain brings a sexual harassment claim against Qwest based on McCormick's conduct, the Court does not find that there is any evidence that McCormick subjected Ms. Yeargain to a hostile work environment.  The allegations Ms. Yeargain makes regarding McCormick, including the comments he made about the lawsuit outside the workplace, were not comments of a sexual nature, nor were they sufficiently severe to alter the conditions of her employment.  Additionally, once Qwest became aware of these comments, a prompt investigation occurred and he was disciplined accordingly.  Summary judgment as to Qwest's liability for McCormick's conduct will be granted.

### b. McCormick

If there is an individual claim for sexual harassment made by Ms. Yeargain against McCormick, that claim should be dismissed.  Individual liability does not exist under Title VII or the IHRA.  *See Craig v. M&O Agencies*, 496 F.3d 1047, 1058 (9th Cir. 2007); *Paterson v. State of Idaho*, 128 Idaho 494, 501, 915 P.2d 724, 731 (1996).

### 2. Intentional Infliction of Emotional Distress

Qwest maintains its conduct was not intentional and cannot constitute extreme or outrageous behavior, particularly because it was not aware of Landry's conduct toward Ms. Yeargain until Ms. Wenick made a complaint with the Advice Line.  At that time, Qwest launched an investigation that resulted in Landry's termination.  Regarding a claim of intentional infliction of emotional distress against McCormick made by Ms. Yeargain, McCormick points out that the conduct Ms. Yeargain complains of is not sufficiently severe or outrageous to support this claim against him.

### a.  Qwest

Similar to the Court's analysis of Ms. Benzie's claim of intentional infliction of emotional distress against Qwest, the Court finds there is an absence of evidence in support of this claim.  Even the facts as alleged by Ms. Yeargain do not amount to extreme and outrageous conduct on the part of Qwest.  Qwest's conduct in responding to the complaints was not extreme or outrageous as defined by case law and did not exceeds all bounds of decency.  Summary judgment will be granted in favor of Qwest.

### b.  McCormick

The Court also finds that Ms. Yeargain's claim against McCormick fails.  Her allegations regarding McCormick include: that he did not report her complaints to the Qwest Advice Line, which she asked him not to do; and that he confronted her and made comments about "getting in trouble" for failing to her complaints to the Advice Line.  Even construing the facts in Ms. Yeargain's favor, they simply do not amount to extreme and outrageous conduct on McCormick's behalf.  Summary judgment will be granted.

### 3.  Negligent Hiring, Training, Supervision and Retention

In viewing Ms. Yeargain's claim, the Court finds there are no genuine issues of material fact as to whether Qwest acted negligently regarding its hiring, training, supervision or retention of Landry or McCormick.  Similar to the analysis under the Title VII claims, Qwest had no knowledge of any inappropriate conduct toward Ms. Yeargain until June 2005 and after that time, she no longer had contact with Landry.  Once the multiple allegations involving Landry came to light, a prompt investigation occurred and he was terminated.  With respect to McCormick, when Qwest became aware that McCormick failed to call the Qwest Advice Line

when Ms. Yeargain first reported Landry's conduct, even though he was asked not to report it by Ms. Yeargain, Qwest still disciplined McCormick.  Also, once Qwest had knowledge that McCormick had approached Ms. Yeargain outside the workplace about her sexual harassment complaint, Qwest investigated the situation and disciplined him.

## D.    Plaintiff Kristen Engels

In the same time period that Ms. Yeargain was encountering unwanted comments and touching by Landry, Ms. Engels was having similar experiences.  During the spring of 2005, Mr. Landry grabbed and fondled Ms. Engels between her legs and stated:  "I'll bet this isn't getting any use.  Do you have any cobwebs in your coochie?"  *Comstock Aff.*, Ex. 10, *Deposition of Kristen Engels*, *"Engels Dep."* p. 93, ll. 10-15 (Docket No. 50-11); *Walton Dec*., Ex. A., *Ayars Dep.,* Ex. 2.  Ms. Engels also stated that Landry would massage her shoulders, grab her breasts, try to look down her shirt and make offensive comments such as "your boobs are huge." *Comstock Aff.*, Ex. 10, *Engels Dep.*, pp 93-94; *Walton Dec.*, Ex. A, *Ayars Dep.*, Ex. 2.  In June 2005, Ms. Yeargain had informed Ms. Engels that she had told McCormick about Landry's behavior toward herself and other women in the office.  *Comstock Aff.*, Ex. 10, *Engels Dep.*, pp. 337-339.  Soon after Ms. Yeargain told Ms. Engels this, Landry approached Ms. Engels, apologized and asked her to apologize to Ms. Yeargain on his behalf.  *Id.*  Ms. Engels did not feel it was necessary to report Landry's conduct herself because she believed McCormick, her manager, already knew about the behavior.[20]  *Id.*

---

[20]  Ms. Engels relates another incident as one of her reasons for not reporting Landry's conduct.  Ms. Engels experienced a situation, possibly in March 2004, in which her coach at Qwest, Mark Lightner, and other employees were playing with a Nerf football and shattered a glass frame in the office.  *Comstock Aff.*, Ex. 10, *Engels Dep.*, pp. 71-74.  Ms. Engels asked Mr. Lightner to stop and he told her to "get over it."  *Id.*  Ms. Engels emailed Jodi McCrosky about the incident.  *Id.*  Ms. Engels was upset about the situation and activated a busy signal on her phone so customers could not get through to her line.  *Id.*  She believes that Mr. Lightner knew she had told Ms. McCrosky about the incident so he activated a trace on her phone that recorded all her phone activity.  *Id.*  Mr.

**Memorandum Decision and Order - Page 23**

In July 2005, as detailed above, Ms. Wenick made a complaint to the Qwest Advice Line which resulted in an investigation and the events involving Ms. Engels came to light.  Ms. Engels was interviewed, as were several other individuals, and Landry was ultimately terminated for his conduct.

### 1.        Title VII and IHRA Sexual Harassment Claims

Qwest submits the same arguments that were made in regards to Ms. Yeargain's claim above, that Qwest had no reason to know, prior to June 2005, of the incidents involving Ms. Engels and Landry.  Additionally, once McCormick was informed of these incidents by Ms. Yeargain, Qwest submits adequate remedial action was taken and no further inappropriate conduct occurred.

Based on the law set forth above and similar to the analysis above with respect to Ms. Yeargain, the Court finds there are no genuine issues of material fact.  Qwest was not on notice of Landry's conduct toward Ms. Engels until June 2005 when Ms. Yeargain complained to McCormick.  Ms. Engels never made any complaints about Landry's behavior to her managers or the Qwest Advice Line.  She does not allege any further harassment occurred after Ms. Yeargain's conversation with McCormick.  As stated above, an employer cannot be liable for any misconduct until it is put on notice.  Accordingly, there is no liability on the part of Qwest.  No acts of misconduct occurred after it was on notice.  Summary judgment will be entered in its favor. [21]

---

Lightner reported that Ms. Engels had activated her busy signal to Ms. McCrosky and Ms. Engels was suspended from work for three days.  *Id.*  Only once she returned to work was she able to tell her side of the story.  *Id.*

[21] Ms. Engels has conceded to the dismissal of her Title VII and IHRA claims against McCormick.

**Memorandum Decision and Order - Page 24**

### 2.      Intentional Infliction of Emotional Distress

Again, Qwest submits similar arguments as made in regards to Ms. Yeargain's claim, including that it launched a prompt investigation once it became aware of Landry's conduct after Mr. Wenick's complaint.  This investigation resulted in Landry's termination.

#### a.      Qwest

The Court finds, as it did with Ms. Benzie and Ms. Yeargain, that Qwest's conduct toward Ms. Engels was not extreme and outrageous.  Summary judgment will be granted in its favor.

#### b.      McCormick

Ms. Engels does not make any specific allegations, nor offers any evidence, about McCormick's conduct toward her.  The only possible allegation would be that once Ms. Yeargain complained to McCormick, he did not go to the Qwest Advice Line.  Such an allegation, even if true, is not sufficient to survive summary judgment on a claim of intentional infliction of emotional distress. Accordingly, the Court grants for summary judgment in McCormick's favor.

### 3.      Negligent Hiring, Training, Supervision and Retention

As stated previously in regard to Ms. Yeargain, the Court finds there no are genuine issues of material fact as to foreseeability of Landry's acts toward Ms. Engels.  Ms. Engels never reported Landry's conduct to a supervisor or the Qwest Advice Line.  Summary judgment on this claim is granted.

## E.      Plaintiffs Mr. Benzie and Mr. Engels

Defendants move for summary judgment on Plaintiffs Mark Engels and Ryan Benzie's

claims of loss of consortium that are based on their wives' claims under Title VII and IHRA.

Defendants submit that federal courts have denied derivative loss of consortium claims based

upon violation of the spouse's human rights.  *See Brown v. Youth Services Int'l of Baltimore,*

*Inc.*, 904 F. Supp. 2d 469 (D. Md. 1995).  Remedies under the IHRA do not allow loss of

consortium claims.  *See Jeremiah v. Yankee Machine Shop, Inc.*, 131 Idaho 242, 953 P.2d 992

(1998).  These plaintiffs agree and concede that their loss of consortium claims based on the

Title VII and IHRA claims should be dismissed.  They do, however, retain their loss of

consortium claims based on their wives' tort claims.

## **ORDER**

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS**

**HEREBY ORDERED that:**

1)      Defendants Qwest and McCormick's Motion for Partial Summary Judgment

(Docket No. 35), filed September 1, 2007, be GRANTED IN PART and DENIED IN PART.

DATED: February 4, 2008

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge

**Memorandum Decision and Order - Page 26**